IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VENISA FIELDS,

  Plaintiff,

v.              Case No.: 08-cv-02572-PWG

MICHAEL ASTRUE,
  Commissioner of Social Security,

  Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \*

**<u>MEMORANDUM</u>**

**I. BACKGROUND**

Venisa Fields (sometimes referred to as "Claimant" or "Ms. Fields") brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner"), denying her claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-33. Pending, by their consent, are the parties' cross-motions for summary judgment. ECF Nos. 18, 25. No hearing is necessary. Loc. R. 105.6. For the reasons set forth below, the decision of the Commissioner is vacated and the case is remanded for further proceedings consistent with this Memorandum.

Ms. Fields applied for DIB on January 18, 2005, alleging that she has been disabled since November 8, 2004, due to hepatitis C. Tr. 17. Ms. Fields' claim was denied initially on May 31, 2005, and denied upon reconsideration on August 22, 2005. *Id*. Ms. Fields filed a timely request

for a hearing and appeared, with representation, before the Honorable Harry H. Barr, Administrative Law Judge ("ALJ") on November 9, 2006. *Id*.

In a written decision dated November 22, 2006, the ALJ denied Ms. Fields' claim, concluding that, through the date of the decision, Ms. Fields was not under a disability as defined in the SSA. *Id*. at 17-25. The Appeals Council denied Ms. Chapman's request for review on September 5, 2008, making the ALJ's decision the final, reviewable decision of the Commissioner. Tr. 6-9.

## II.     STANDARD OF REVIEW

The function of this Court is not to review Ms. Fields' claim *de novo* or reweigh the evidence of record. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Rather, this Court is to determine whether, upon review of the whole record, the Commissioner's decision is supported by substantial evidence and a proper application of the law. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1996). It is such relevant evidence as a reasonable mind might accept as adequate to support a verdict were the case before a jury. *Johnson v. Califano*, 434 F. Supp. 302, 307 (D. Md. 1977). Usually, if there is substantial evidence to support the Commissioner's decision, the decision must be upheld. 42 U.S.C. § 405(g); *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

In addition to reviewing the ALJ's decision to determine whether it is supported by substantial evidence, this Court must also determine whether the ALJ properly applied the law.

"A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman*, 829 F.2d at 517. After reviewing the ALJ's decision, this Court may affirm, modify, or reverse the decision of the ALJ and may remand the case for a rehearing. 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991); *Coffman*, 829 F.2d at 519; *Vietek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971).

In determining whether a claimant is disabled within the meaning of SSA, the Commissioner has promulgated regulations that set forth a five-step sequential evaluation procedure. *See* 20 C.F.R. § 416.920(a). This five-step process, described by the Supreme Court in *Bowen v. Yuckert*, 482 U.S. 137 (1987), begins with the ALJ determining whether the claimant is engaged in substantial gainful activity, which is defined for DIB claims in 20 C.F.R. § 404.1517 *et seq*. If the claimant is engaged in a substantial gainful activity, the claimant is considered not disabled. 20 C.F.R. § 404.1517. If the claimant is not engaged in substantial gainful activity, the ALJ next examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. §§ 404.1509.

If the durational and severity requirements are met, the ALJ's analysis proceeds to a third step—a consideration of whether the impairment or impairments, either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is known as the Listing of Impairments ("Listings"). *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). If one of the Listings is met, disability will automatically be found without consideration of age, education, or past work experience. If a Listing is not met, however, the ALJ moves to a fourth step and considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant

work. *Bowen*, 482 U.S. at 141; *Mastro*, 270 F.3d at 177. If the ALJ finds that a claimant retains the RFC to perform past relevant work, claimant will be found to be not disabled. *Bowen*, 482 U.S. at 141; *Mastro*, 270 F.3d at 177.

If a determination is made that the claimant is not capable of performing his or her "past relevant work" the ALJ moves to the final step and considers whether, based upon the claimant's RFC, age, education, and past work experience, the claimant is capable to perform some other work. *Bowen*, 482 U.S. at 142; *Mastro*, 270 F.3d at 177. At this step the burden shifts to the Commissioner. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). If the claimant suffers solely from exertional impairments,[1] the Medical-Vocational guidelines, as defined in Part 404, Subpart P, Appendix 2 ("Guidelines"), provide the applicable rules to determine whether a claimant is disabled. An ALJ, in applying the Guidelines, will examine the claimant's age, education, past work experience, and RFC to determine which rule applies. 20 C.F.R. § 404.1520(d). The applicable rule will direct a conclusion as to whether a claimant is disabled. *Id.*

The Guidelines, however, will not be used when the claimant suffers from both exertional and non-exertional impairments. 20 C.F.R. § 404.1569a(d). In such a case, the ALJ is required to employ the use of a vocational expert to determine whether the claimant is still capable of some work. 20 C.F.R. § 404.1560. If the claimant is not capable, disability will be found.

---

[1] Impairments may be exertional and non-exertional. An exertional limitation is one that affects the claimant's ability to meet the strength demands of certain jobs. 20 C.F.R. § 416.969a(b). A non-exertional impairment is a "limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983). "[W]here the claimant's impairment is non-exertional—not manifested by a loss of strength or other physical ability—or is marked by a combination of exertional and nonexertional impairments, the grids' Rules are not conclusive, and full individualized consideration must be given to all relevant facts of the case." *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).

## III. ALJ'S DECISION

After reviewing all of the evidence, including the medical records and Ms. Fields' testimony, the ALJ made the following findings:

1. The Claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since November 8, 2004, the alleged onset date.

3. The claimant has the following severe impairment: hepatitis C.

4. The claimant does not have any impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant has the residual functional capacity to perform unskilled medium exertion work. She is capable of lifting, carrying, pushing and pulling twenty-five pounds frequently and fifty pounds occasionally; sitting about six hours in an eight-hour workday; and, standing and/or walking about six hours in an eight-hour workday. She can follow simple instructions and complete simple tasks. The claimant is able to perform sustained work activity on a regular and continuing basis.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born January 4, 1960 and was forty-four years old on the alleged disability onset date, which is defined as a younger individual.

8. The claimant graduated from high school and attended four years of college. She is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled."

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a "disability," as defined in the SSA, from November 8, 2004 through the date of this decision.

## IV. SUMMARY OF EVIDENCE

Ms. Fields is a 2000 graduate of Virginia Wesleyan College. Tr. 156. She began her most recent career as a staff writer for the Military Newspapers of Virginia sometime in 1999, and for the Virginian Pilot in October 1999. Tr. 156.

Ms. Fields was diagnosed with hepatitis C on March 27, 2003 by internal medicine specialist, Dr. Sue Beth Hudson, whom later asserted that she "was sure [Ms. Fields] was infected many years before." Tr. 242, 285. Ms. Fields had been under the care of Dr. Hudson since 1996. Tr. 160, 285. Ms. Fields continued to visit Dr. Hudson on several occasions until June 12, 2006. Tr. 294.

During a follow up visit on April 10, 2003, Dr. Hudson reported that Ms. Fields complained of fatigue, particularly in the afternoon, which Dr. Hudson determined was the result of adrenal dysfunction from carrying her chronic infection. Tr. 241.

The record from a subsequent follow-up visit to Dr. Hudson on July 21, 2003 reveals that Ms. Fields "felt pretty good" when she did not "work too much or get overly involved with family." Tr. 240. However, she also noted that when she does get tired, her "exhaustion is overwhelming to the point that sometimes she has to go to bed for 4 days at a time." Tr. 240.

During the last follow up visit to Dr. Hudson in 2003, the doctor reported on November 12th that Ms. Fields had taken time off due to her hepatitis C and that she had, as a result,

improved her stamina, but still suffered significantly. Tr. 238. The doctor also noted that Ms. Fields had received a formal memo from her boss, indicating that her performance over the last nine weeks had "not been up to par." Tr. 238. Dr. Hudson expressed concern that Ms. Fields would not be able to complete thirty hours at work and as a result, would fail to meet the expectations of her boss. Tr. 238. Dr. Hudson opined that Ms. Fields "could only work 20 hours a week and probably only 10 in the office." Tr. 238. Two months later, on January 8, 2004, Dr. Hudson wrote that she would suggest Ms. Fields, who continued to work full-time, to take a minimum of three, and possibly six, weeks off. Tr. 237.

Ten months later, on November 4, 2004, Ms. Fields made a visit to Dr. Hudson, whom observed that Ms. Fields was not taking any medications. Tr. 235. Dr. Hudson noted that Ms. Fields was still "having difficulty letting [her] job go" despite it being extremely stressful. Tr. 236. Ms. Fields also began experiencing hip pains. Tr. 236.

The following month, on December 16, 2004, Ms. Fields learned of a positive test for rheumatoid arthritis (i.e. positive Rheumatoid Factor, or RF), which the doctor thought "would explain her hip pain and generalized arthralgias and may be significantly contributing to her fatigue." Tr. 235. Dr. Hudson reported that Ms. Fields felt "toxic, dizzy, light-headed, and felt weird all over" in the morning, which was similar to Ms. Fields' condition a week ago when she had experienced episodes of nausea and diarrhea. Tr. 235. The doctor felt, however, that Ms. Fields' anxiety of her disease contributed heavily to her symptoms, and stated that "most of this is probably reactivity to the news." Tr. 235. In addition, Dr. Hudson also noted that Ms. Fields "finally decided to address the Hepatitis C and be a little more aggressive with it." Tr. 235. At this point, Ms. Fields was not working, and Dr. Hudson determined that she would be out of work for up to a year. Tr. 235. After approximately one month, during a follow up visit to Dr.

7

Hudson on January 12, 2005, Ms. Fields was reported to have "been doing relatively well" and "been doing generally better." Tr. 234.

Three months later, Dr. Hudson reported that Ms Fields visited rheumatologist Dr. Albert Lee on February 25, 2005. Tr. 233. According to Dr. Hudson, Dr. Lee opined that most of Ms. Fields' arthralgias was a function of Hepatitis C, not her Rheumatoid arthritis. Tr. 166, 233.

On April 8, 2005, Dr. Robert Mitchell of Dominion Psychiatric Associates evaluated Ms. Fields for North Carolina Department of Health and Human Services Disability Determination Services ("DDS"). Tr. 167-68. Dr. Mitchell characterized Ms. Fields' health problems as "hepatitis C with a primary complication of generalized and increasing fatigue along with multiple gastrointestinal symptoms that have been increasingly debilitating. In addition, she has recently developed arthritic complications" that Dr. Hudson said "are associated with and directly related to her hepatitis C." Tr. 167. Ultimately, Dr. Mitchell concluded that Ms. Fields "would certainly be able to perform simple repetitive tasks," and that "from a psychological point, she is able to tolerate stress and pressures associated with daily work activity." Tr. 168.

Twelve days later, on April 20, 2005, Ms. Fields had Elizabeth Anton, Psy.D. complete a Psychiatric Review Technique form, which included, *inter alia*, determinations of the degree of her functional limitations. Tr. 180. The four functional limitations listed were: (1) Restrictions of Activities of Daily Living, (2) Difficulties in Maintaining Social Functioning, (3) Difficulties in Maintaining Concentration, Persistence, or Pace, and (4) Episodes of Decompensation, Each of Extended Duration. Tr. 180. For each of the first three functional limitations, Dr. Anton marked that Ms. Fields' degree of limitation was "mild" based on a 5-point scale, which include, from lowest to highest: None, Mild, Moderate, Marked, and Extreme. Tr. 180. Dr. Anton also marked that Ms. Fields did not experience any episodes of decompensation. Tr. 180. Based on

her evaluation, Dr. Anton determined that Ms. Fields experienced no medically determinable impairment. Tr. 170.

On May 7, 2005, Dr. Johnson P. Draughton Jr., of Family Medicine and Rehabilitation Center in Goldsboro, North Carolina, performed a DDS examination of Ms. Fields. Tr. 185-89. According to Dr. Draughton, Ms. Fields admitted to experiencing indigestion, abdominal discomfort, and heartburn, but denied "chest pain, nausea, vomiting, diarrhea, shortness of breath, loss of consciousness, fever, chills, vision change, swelling of her lower extremities, and bowel and bladder incontinence." Tr. 186. Furthermore, Dr. Draughton noted that Ms. Fields indicated that she was not having any back pains or rheumatoid arthritis, despite them being listed on her disability sheet. Tr. 188. Likewise, Dr. Draughton concluded that Ms. Fields "is a normally developed woman in no apparent distress." Tr. 186. He stated that she walked with a normal gait, without a limp and without a cane, that her dexterity was normal, and that she had "5/5 strength throughout." Tr. 186. Thus, Dr. Draughton concluded that Ms. Fields' "rehabilitation potential was good if she could get her pain under control." Tr. 188.

Ms. Fields underwent another review by DDS physician Dr. Robert Gardner on May 25, 2005. Tr. 190-99. Dr. Gardner completed a Residual Functional Capacity Assessment of Ms. Fields. Tr. 192-99. In his evaluation, Dr. Gardner determined that Ms. Fields could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for a total of "about 6 hours in an 8-hour workday," sit (with normal breaks) for a total of "about 6 hours in an 8-hour workday," and her ability to push and/or pull was unlimited. Tr. 193. Moreover, the assessment provided that postural limitations, manipulative limitations, visual limitations, communicative limitations, and environmental limitations had not been established. Tr. 194-96. Dr. Gardner's notes also largely confirmed Dr. Draughton's findings, and stated further that Ms. Fields is

9

capable of "medium exertion" based on her activities of household cleaning, laundry, dishes, lawn mowing, easy household repair, sweeping, and raking. Tr. 194.

During another visit to Dr. Hudson on June 8, 2005, Ms. Fields was observed as experiencing "a history of Hepatitis C," resulting chronic fatigue, and arthralgias. Tr. 232. On that visit, however, Ms. Fields most significant suffering was the result of a "viral type of episode" with nausea and general fatigue. Tr. 232. Dr. Hudson also reported that Ms. Fields had experienced right shoulder pain for over three weeks following heavy lifting and house redecorating, which involved lifting twenty to twenty-five pounds. Tr. 232. Due to her shoulder pain, Ms. Fields had trouble putting on her jackets, putting her hand behind her back, and strapping on her bra. Tr. 232.

Dr. Hudson, however, crossed out the portion of the Multiple Impairments Questionnaire she filled out later on June 14, 2005 that asked her to describe any pain Ms. Field suffered. Tr. 201-02. Yet, among the symptoms that Dr. Hudson included was "diarrhea with abdominal pain" (among "fatigue, chronic arthritis, and elevating constipation"). Tr. 201. The questionnaire also asked Dr. Hudson to assess the RFC of Ms. Fields, just as was asked of Dr. Gardner in the May 25, 2005 Residual Functional Capacity Assessment. Tr. 202-07. In that portion of the questionnaire, Dr. Hudson marked that Ms. Fields could work for four to five hours in an eight-hour workday, stand/walk for zero to one hour in an eight-hour workday, frequently lift zero to five pounds, occasionally life five to ten pounds, frequently carry zero to five pounds, and occasionally carry five to ten pounds. Tr. 202-03. Dr. Hudson also marked that Ms. Fields would have "significant limitations in doing repetitive reaching, handling, fingering, and lifting due to exhaustion." Tr. 203. Similarly, Dr. Hudson indicated that Ms. Field would have a moderate degree of limitation for both arms in grasping, turning, and twisting objects,

using fingers/hands for fine manipulations, and using arms for reaching. Tr. 203-04. Finally, Dr. Hudson noted that Ms. Fields would frequently experience "pain, fatigue or other symptoms severe enough to interfere with attention and concentration" and as a result, would only be capable of low stress work. Tr. 205.

On July 26, 2005, Dr. Hudson provided a Disability Narrative Note on Ms. Fields' condition. Tr. 231. Dr. Hudson summarized all the findings relevant to Ms. Fields' disability, which included her right shoulder pain, history of chronic hepatitis C, rheumatoid arthritis, and "overwhelming fatigue, generalized aches and pains in muscles and joints, and some impairment of memory and concentration, mainly from overwhelming exhaustion after working for only up to 4 hours." Tr. 231. Dr. Hudson further stated that Ms. Fields "has the ability to do general activities of daily living; but ongoing weight-bearing activity, overheating, noxic gas exposure, etc., are incapacitating; and . . . she has some short-term memory loss and decreased concentration due to the Hepatitis C and/or the rheumatoid." Tr. 231.

On July 28, 2005, Ms. Fields showed signs of improvement. Although Dr. Hudson observed a "very mild tear," among other issues, with her shoulder, the doctor stated that "[t]here does not seem to be any ongoing problems. If she does use the shoulder, it tends to improve . . . ." Tr. 230. Similarly, the doctor noted that due to Ms. Fields increased proactivity in her homeopathy treatment, "[h]er Hepatitis C is stable." Tr. 230. At the end of her report, Dr. Hudson stated that Ms. Fields' positive RF may be a symptom of her hepatitis C. Tr. 230.

Ms. Fields' final follow up visit with Dr. Hudson on December 14, 2005 revealed that Ms. Fields had improved her condition. Dr. Hudson reported that Ms. Fields "has been doing a lot better" as a result of eating healthy and taking vitamins, minerals, and proteins, which Dr.

Hudson had "been urging her to do for a long time." Tr. 229. Dr. Hudson also found that Ms. Fields was "having no other significant problem." Tr. 229.

On July 29, 2005, Dr. Jeff R. Willis of Digestive and Liver Disease Specialists, examined Ms. Fields. Tr. 208-09. He stated that she complained of chronic fatigue, but was unwilling to have a liver biopsy. Tr. 161. On January 3, 2006, Dr. Willis filled out a Liver Disease Impairment Questionnaire on Ms. Fields. Tr. 273-78. Positive clinical findings of loss of appetite/weight loss, persistent or relapsing chronic fatigue, and headaches were found. Tr. 161. Dr. Willis concluded that the claimant can sit for no more than four hours and stand/walk for no more than two hours during the course of an eight-hour work day. Tr. 161. Dr. Willis also concluded that Ms. Fields could occasionally lift up to twenty pounds and occasionally carry ten pounds. Tr. 161. On September 12, 2006, Dr. Willis filled out another version of the Liver Disease Impairment Questionnaire. Tr. 286-92. Dr. Willis' responses on the second version of the form are nearly identical to his responses on the first version of the form.

On June 20, 2006, Ms. Fields returned to Dr. Hudson. Tr. 303. Dr. Hudson completed another version of the Multiple Impairment Questionnaire on September 11, 2006. Tr. 294-301. This questionnaire concluded that Ms. Fields could sit for two to three hours and stand/walk for one to two hours in an eight-hour workday. Tr. 296. Dr. Hudson also recommended that Ms. Fields may occasionally carry between five and twenty pounds, and frequently carry between zero and five pounds. Tr. 297. As well, Dr. Hudson concluded that Ms. Fields has significant limitations doing repetitive reaching, handling, fingering, or lifting. *Id*. The doctor also states that Ms. Fields suffers from frequent pain and fatigue that will last at least twelve months. Tr. 299. In sum, Dr. Hudson concluded: "I cannot recommend [Ms. Fields] return to work until she achieves long term, sustained symptom relief and negative viral load." Tr. 300.

12

V. ANALYSIS

Ms. Fields maintains that ALJ Barr erred in several ways. First, Ms. Fields alleges that ALJ Barr erroneously evaluated her subjective complaints. Pl.'s Br. 3-4. Second, Ms. Fields argues that ALJ Barr erroneously evaluated her residual functional capacity ("RFC"). *Id*. at 5-8. Next, Ms. Fields maintains that ALJ Barr failed to properly evaluate the opinions of her treating physicians. *Id*. at 8-12. Lastly, Ms. Fields argues that ALJ Barr improperly relied on the Medical-Vocational Guidelines in determining that she was not disabled. *Id*. at 12-14. For the reasons that follow, I agree with some, but not all, of her arguments.

A. **ALJ Barr Properly Assessed Ms. Fields Subjective Complaints.**

The ALJ is required to follow a two-step process to evaluate the plaintiff's subjective complaints with regard to her disability. 20 C.F.R. § 404.1529; Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A.); *see also Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1992) (per curiam); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989) ("Pain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function. Further, while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity."). First, the ALJ must consider the relevant medical evidence, and second, the ALJ must provide an adequate explanation of the findings. 20 C.F.R. § 404.1529; SSR 96-7p. When providing the explanation, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Contrary to Ms. Fields' assertion, ALJ Barr did not require objective medical evidence of pain to substantiate her subjective statements. ALJ Barr found "that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 21. In coming to this conclusion, ALJ Barr provided a detailed discussion of Ms. Fields' daily activities, the treatment notes from Ms. Fields' treating physicians, and medical opinion evidence. Tr. 21-24. The evidence cited in ALJ Barr's decision contained specific findings, sufficiently detailed, and was supported by substantial evidence.

> B. **ALJ Barr Was Not Required to Give Controlling Weight to the RFC Assessment of the Treating Physicians, Drs. Hudson and Willis; However, ALJ Barr Failed to Apply Proper Factors Required by the Commissioner's Regulations in His Explanation of the Weight Given to Ms. Fields' Treating Physicians' Assessments.**

In performing the residual functional capacity analysis, ALJ Barr included a discussion of Ms. Fields' own statements, the opinions of Ms. Fields' treating physicians, Dr. Hudson and Dr. Willis, and the opinions of the state medical physicians. Tr. 22-24. In Dr. Hudson's opinion, Ms. Fields could "sit for three hours in an eight-hour workday, stand/walk for two hours, and lift and carry twenty pounds, [and] concluded that [Ms. Fields] was not even capable of low stress work." Tr. 23. ALJ Barr found that "the conclusions of Dr. Hudson are not supported by the overall record or her treatment notes which reflect that [Ms. Fields] is doing well." *Id*. In Dr. Willis' opinion, Ms. Fields could "sit for four hours in an eight-hour workday, stand for two hours in an eight-hour workday, and lift and carry ten pounds, [and] concluded that [Ms. Fields] could not sustain an eight-hour workday." *Id*. ALJ Barr found, with regard to Dr. Willis' opinion, "[n]ot only is the treatment relationship not consistent, but the opinions are regarding

14

issues reserved for the Commissioner and are unsupported by the treatment notes and the overall record." *Id*. ALJ Barr gave "significant weight" to the assessments of the state agency medical physicians. Tr. 24.

Ultimately, ALJ Barr found, consistent with the assessment of the state agency medical physicians:

> [Ms. Fields] has a residual functional capacity to perform unskilled medium exertion work. She is capable of lifting, carrying, pushing and pulling twenty-five pounds frequently and fifty pounds occasionally; sitting about six hours in an eight-hour workday; and standing and/or walking about six hours in an eight-hour workday. She can follow simple instructions and complete simple tasks. [Ms. Fields] is able to perform sustained work activity on a regular and continuing basis.

Tr. 21.

The Commissioner must give controlling weight to an opinion from a treating source if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (2008); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). However, the adjudicator need not give controlling weight to an opinion on an issue reserved to the Commissioner; in fact, giving controlling weight to such opinions "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5P (1996 WL 374183, *2). The determination of an individual's RFC is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). An individual's RFC "is the most [the individual] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1); *see* 20 C.F.R. § 404.1546(c) ("[A]t the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity."). The opinions of Ms. Fields' treating physicians discuss her inability to perform job functions despite her

15

limitations, and are therefore on an issue reserved to the Commissioner and may not be given controlling weight.

Although opinions from a medical source on issues reserved to the Commissioner are not entitled to controlling weight, they "must never be ignored" by the adjudicator. SSR 96-5P at *2. "[T]he adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* In performing this evaluation, "the adjudicator must apply the applicable factors in 20 C.F.R. § 404.1527(d)." *Id.* These factors include: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of the treatment relationship"; (3) the degree to which the physician supports his or her opinion with relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the adjudicator's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6).

Although ALJ Barr listed the above factors in a footnote, he did not consider or discuss them all when he decided to afford little if any weight to the opinions of Ms. Fields' treating physicians. It is true that ALJ Barr acknowledged the medical assessments of Dr. Hudson and Dr. Willis, which indicated that Ms. Fields was unable to sustain full-time employment. Tr. 22-23. However, it is unclear exactly how much weight ALJ Barr accorded to Ms. Fields' treating physicians. *Id*. at 23. ALJ Barr only indicated, in conclusory fashion, that Dr. Hudson's opinion was "not supported by the overall record or her treatment notes," and with regard to Dr. Willis, ALJ Barr added, again, in conclusory fashion, that the "treatment relationship was not consistent." With regard to Dr. Hudson, the ALJ addressed one of the factors listed in § 404.1527(d) (consistency between the opinion and the record as a whole), and with regard to Dr.

Willis, only two of the six factors (treatment relationship and consistency between the opinion and the record as a whole). *Id*.

ALJ Barr did not discuss any of the additional factors. For example, § 404.1527(d)(2)(i) requires the ALJ to consider the length and frequency of treatment. When Dr. Hudson completed the medical assessment form in September 2006, she had seen Ms. Fields at least sixteen times in the previous three years, Tr. 229-43, 294-301; however, the ALJ did not make any factual findings related to the length or nature of this relationship. Besides the consistency between the opinion and the record as a whole, ALJ Barr failed to provide any discussion at all when affording little or no weight to Dr. Hudson's opinions, who was Ms. Fields' treating physician since 1996, and only made passing reference to an inconsistent treatment relationship with Dr. Willis. For these reasons, ALJ Barr did not provide the appropriate discussion when deciding the weight to afford the opinions of Ms. Fields' treating physicians.

Thus, ALJ Barr did not indicate what weight he gave to the opinions of Drs. Hudson and Willis, nor did he discuss the factors in determining what weight to give this evidence under 20 C.F.R. § 404.1527(d). Consequently, the ALJ did not properly apply the law. *See Coffman*, 829 F.2d at 517. Therefore, the ALJ's decision is vacated and the case is remanded for further proceedings consistent with this Memorandum.


Dated: June 14, 2011 _____/s/_____
Paul W. Grimm
United States Magistrate Judge

mpk